## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHOCTAW NATION, ) | |
| P.O. Box 1210 ) | |
| Durant, OK 74702-1210, ) | |
| ) | |
| Plaintiff, ) | Case No.: _____ |
| ) | |
| v. ) | |
| ) | |
| KATHLEEN SEBELIUS, ) | |
| Secretary of the U.S. Dep't of Health ) | |
| and Human Services ) | |
| 200 Independence Avenue, S.W. ) | |
| Washington, D.C. 20201, ) | |
| ) | |
| and ) | |
| ) | |
| YVETTE ROUBIDEAUX, ) | |
| Director of the U.S. Indian Health Service ) | |
| 801 Thompson Avenue, TMP 450 ) | |
| Rockville, MD 20852, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## COMPLAINT

The Choctaw Nation (Nation) complains and alleges as follows:

## I. INTRODUCTION

1.      This action is a follow-on case to Cherokee Nation v. Leavitt, 543 U.S. 631 (2005), Salazar v. Ramah Navajo Chapter, 567 U.S. __, 132 S. Ct. 2181 (2012), and Arctic Slope Native Ass'n, v. Sebelius, 133 S. Ct. 22 (2012), on remand Arctic Slope Native Ass'n, v. Sebelius, 501 Fed. Appx. 957 (Fed. Cir. 2012) (Arctic Slope II).  It involves the failure of the federal government, acting through the Secretary of the U.S. Department of Health and Human Services (HHS or Secretary) and the Director of the Indian Health Service (IHS or Director), to pay in full various "contract support costs" (CSCs) to which the Choctaw Nation was entitled by

operation of law and by contracts entered into pursuant to the Indian Self-Determination and Education Assistance Act (ISDA), 25 U.S.C. §§ 450–458ddd-2.

2.      In each instance alleged below, the Secretary failed to pay the Nation's full contract support cost requirements based upon the Secretary's assertion that appropriated funds were not legally available to make such payments in full.  In <u>Ramah Navajo</u> and <u>Arctic Slope II</u>, the Supreme Court and the Federal Circuit rejected assertions by the Secretary of the Interior and the Secretary of HHS, respectively, in connection with identical underpayments made to other contracting Tribes.  132 S. Ct. at 2186; 501 Fed. Appx. at 959.  Both courts held the Secretaries' failure to pay was a breach of contract.  <u>See</u> 132 S. Ct. at 2090-91; 501 Fed. Appx. at 959.

3.      The claims covered by this Complaint assert that in Fiscal Year (FY) 2006, FY 2007 and FY 2008, the Secretary breached her contracts by failing to pay in full the contract support costs which the Secretary acknowledged were due and owing to the Choctaw Nation under the Nation's contracts.  The Nation seeks as damages the unpaid funds which the Secretary should have paid, and would have paid at the time had there been no breach, and the associated lost third-party collections which the Nation would have collected had each year's unpaid contract support costs been fully paid.  These are the sums necessary to put the Nation back in the position it would have been in had the Secretary not breached her obligations under the ISDA and the Nation's contracts.

4.      The Nation also claims that the Secretary breached each of these contracts by improperly failing to make adjustments to the indirect cost rates employed by the Secretary to calculate the Nation's indirect contract support cost requirement as part of the contract price, and that such adjustments were necessary in order to lawfully calculate the full indirect costs

associated with carrying out the Secretary's contracted programs.  The Nation seeks damages for the Secretary's unlawful action in this respect as well.

## II.  JURISDICTION

5.      This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1331, 1362; 25 U.S.C. §§ 450m-1(a), (d) of the ISDA; and 41 U.S.C. § 7103–7107 of the Contract Disputes Act (CDA).

## III.  PARTIES

6.      The Choctaw Nation is a federally-recognized Indian Tribe with its tribal headquarters in Durant, Oklahoma.  The Choctaw Nation is a "Tribe" as that term is defined by the Indian Self-Determination Act at 25 U.S.C. § 450b(e).

7.      Kathleen Sebelius is the Secretary of the U.S. Department of Health and Human Services.  Secretary Sebelius exercises delegated responsibilities from Congress pursuant to the ISDA and other applicable law.  Dr. Yvette Roubideaux is the Director of the Indian Health Service.  Director Roubideaux exercises authority delegated to her by the Secretary to carry out the Secretary's responsibilities under the ISDA and other applicable law.  As used throughout this Complaint (and unless context commands otherwise), the terms "Secretary," "HHS," "Director" and "IHS" are used interchangeably.

## IV.  FACTS AND GENERAL ALLEGATIONS

### A.  The Contract Documents.

8.      Since February 1, 1985, the Choctaw Nation has operated various Federal health care programs, functions, services, and activities of the Indian Health Service within the IHS Talihina Service Unit pursuant to contracts between the IHS and the Choctaw Nation.  From

January 1, 1995 to the present, the Choctaw Nation has operated federal IHS programs pursuant to Compact No. 60G950037 with the Indian Health Service, as initially authorized under Title III of the ISDA.  The tribally-operated federal IHS programs have expanded since the Nation originally entered the Compact and now cover eight  health centers and clinics and one hospital and associated IHS programs, functions, services, and activities.

9.      This Compact is the basic contract document at issue in this case.  The terms of the Compact are required by and inextricably intertwined with the ISDA.  The Compact was written to "carry out an unprecedented Self-Governance Demonstration Project, authorized by Title III, of the [ISDA]".  Compact, Art. I, § 2(a).  Consistent with this purpose, the Compact relies heavily on the provisions of the ISDA.

10.      According to the Nation's Compact, the core purpose of the contracts between the IHS and the Nation was:

> to enable the Choctaw Nation to redesign services of the Indian Health Service under the terms set forth in the Compact … and Funding Agreement; to reallocate funding for such services, according to its tribal priorities; to provide such services, as determined by its tribal priorities; to enhance the effectiveness and long-term financial stability of its tribal government; and to reduce the Federal bureaucracy . . . .

Compact, Art. I, § 2(b).

11.      The contract documents also include the Nation's Funding Agreements (FAs), which can cover single or multiple year periods.  See generally 25 U.S.C. § 458aaa-4(e) ("[E]ach funding agreement shall remain in full force and effect until a subsequent funding agreement is executed.").  In this case, in FY 2006, the Nation operated pursuant to the FY 2003 FA.  The Nation executed a new FY for FY 2007, which remained in effect in FY 2008.  Further, the FAs

4

are often amended throughout the year to take account of new funds available to the Nation.  The Nation's FAs were incorporated in their entirety into the Compact.  <u>See</u> Compact, Art. V, § 1.

12.     The contract documents that are controlling for the FY 2006, FY 2007 and FY 2008 claims asserted here are the Compact, the FA in effect for that year, modifications to those documents, and other statutory and administrative provisions incorporated by law into such contract documents (including provisions of the ISDA).

**B.  The Contract Price.**

13.     The contractual obligation of the Nation was to administer certain health care programs and provide certain health care services and functions previously provided by IHS. The contractual obligation of IHS, in return, was to make certain specified payments to the Nation; in other words, to pay the contract price.

14.     During the fiscal years at issue here, the Nation's contracts were authorized by Title V of the ISDA, 25 U.S.C. §§ 458aaa-458aaa-18.  Section 508(c) of the ISDA, 25 U.S.C. § 458aaa-7(c), requires that "[t]he Secretary shall provide funds under a funding agreement under this part in an amount equal to the amount that the Indian tribe would have been entitled to receive under self-determination contracts under this subchapter, including amounts for direct program costs specified under section 450j-1(a)(1) of this title and amounts for contract support costs specified under section 450j-1(a) (2), (3), (5), and (6) . . . ."   Thus, at all relevant times, 25 U.S.C. §§ 450j-1(a)(2), (3), and (5) and related funding provisions of Title I of the ISDA, controlled the Secretary's funding obligations under the contracts.  These are the same provisions that the Supreme Court construed in <u>Cherokee Nation</u> and <u>Ramah</u>, and that the Federal Circuit construed in <u>Arctic Slope II</u>.

5

15.     The first referenced section, section 450j-1(a)(1), provides for the direct program funding, also called the "Secretarial amount," representing "the amount the Secretary would have expended had the government itself [continued to] run the program." Arctic Slope Native Ass'n, v. Sebelius, 629 F.3d 1296, 1298–99 (Fed. Cir. 2010), vacated on other grounds 133 S. Ct. 22 (2012).  The FAs determined a contract price for the Secretarial amount prior to commencement of the contract.  The Secretarial amount was subject to being increased or decreased during the contract year to the extent the appropriation supporting the contracted program increased or decreased.  This would be done by a mid-year contract modification.  All of the Choctaw Nation's contracts had mid-year amendments and modifications of this kind throughout the life of the contracts.

16.     In addition to paying the "Secretarial amount," the ISDA and FAs also requires that the IHS pay contract support costs.  Section 450j-1(a)(2) provides that "[t]here shall be added to the amount required by paragraph (1) [i.e. to the Secretarial amount required by § 450j-1(a)(1)] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management . . . ." 25 U.S.C. § 450j-1(a)(2).

17.     These contract support costs are mostly "administrative expenses." Cherokee v. Leavitt, 543 U.S. at 634.  Contract support costs fall into two main categories: indirect contract support costs, "such as special auditing or other financial management costs," id. at 635 (citing § 450j-1(a)(3)(A)(ii)), and direct contract support costs, "such as workers' compensation insurance" for certain annually recurring costs attributable directly to the personnel and facilities employed or used to carry out the federal IHS programs being contracted under the ISDA, id.

(citing § 450j-1(a)(3)(A)(i)).  Contract support costs also include non-recurring one-time "startup costs," id. (citing § 450j-1(a)(5)).

### C.  The Calculation of Contract Support Costs.

18.     During the fiscal years at issue here, IHS calculated and paid contract support costs pursuant to, first, an IHS Circular and, later, the IHS Manual (collectively IHS Manual or IHM).  The IHS Manual explains how CSC requirements are to be determined.  IHS calculated the contract support cost requirement associated with the Choctaw Nation's FY 2006, FY 2007 and FY 2008 contracts pursuant to the IHS Manual.

19.     Pursuant to the IHS Manual, IHS "determine[s]" a contractor's "contract support cost requirement" prior to contract award.  See IHM § 6-3.1E(5).  IHS does this by calculating the contractor's indirect contract support costs and direct contract support costs; by reviewing those costs against the Secretarial amount to eliminate any duplicative costs; and by then setting the net amount as the contractor's "contract support cost requirement."  This is how IHS calculated the Nation's contract support cost requirement in each of the years at issue here.  This, then, is the amount for contract support costs which IHS is obligated to pay under the contract, and is the amount IHS would have paid each year had the agency believed it had sufficient appropriations each year to make such payment.

*i.  Indirect contract support costs.*

20.     Indirect contract support costs are the bulk of the contract support costs.  The IHS Manual instructs how indirect contract support cost requirements will be determined in any given year.  See IHM § 6-3.2E.  The Nation's indirect contract support cost requirements were

determined pursuant to the IHS Manual in connection with the Nation's FY 2006 through FY 2008 contracts.

21.     Generally, indirect contract support costs are determined by a reference to a tribal contractor's "indirect cost rate."  25 U.S.C. § 450b(g).  As the Secretary correctly told the Court in Cherokee,

> [m]ost contract support costs are indirect costs "generally calculated by applying an 'indirect cost rate' to the amount of funds otherwise payable to the Tribe." Brief for Federal Parties 7; see 25 U.S.C. §§ 450b(f)–(g).

543 U.S. at 635.  This is how IHS calculated the Nation's indirect contract support costs here.

22.     The Manual instructs IHS to determine the contractor's contract support cost requirement "by applying the negotiated [indirect cost] rate(s) to the appropriate direct cost base . . . ."  IHM § 6-3.2E(1).  In so doing, IHS uses the contractor's most recent indirect cost rate so long as it is not "more than three-years old."  Id.  IHS multiplies the contractor's most recent indirect cost rate against the direct cost base paid under the contract (i.e., the Secretarial amount less appropriate exclusions) to calculate the amount due for indirect contract support costs.  The direct cost base also includes all direct contract support costs.  See IHM § 6-3.4E(1) ("The DCSC, along with other Section 106(a)(1) funds, will be considered part of the recurring base of the award."); IHM § 6-3.3A(3) ("[CSC] funding is based on the total amount associated with the [programs, functions, services, and activities] awarded from the date of assumption through the end of the FA performance period, not to exceed 12 months.").  If, as was the case here, the contractor has contracted to operate Area or Headquarters "tribal shares," an adjustment is made to reflect that 20% of such tribal shares are not to be included in the direct cost base and are

instead to be considered a credit against the indirect contract support cost requirement. IHM § 6-3.2F(2). This is how IHS calculated the Nation's indirect contract support costs here.

23.     In broad terms, the rate used to calculate indirect contract support costs is determined by comparing the contractor's overall administrative or overhead costs for all of a contractor's functions (the indirect cost pool) as a percentage of the total money spent by the contractor for all of the programs it operates (the direct cost base).

24.     Tribal contractors primarily use two different types of indirect cost rates: either a "provisional-final" rate or a "fixed with carry forward" rate. For each year at issue here, the Nation had a "fixed with carry forward" rate. A "fixed with carry forward rate" is "fixed" in advance for a given year and remains "fixed" for that contract year—in other words, it is a predetermined rate which does not change and which generates a fixed contract price for the year. The rate is calculated by the contractor's "cognizant agency," see Office of Management and Budget (OMB) Cir. A-87, § B.6, which for the Nation was the Interior Department, acting through the National Business Center (NBC). For the three contract years at issue here, NBC set the Nation's fixed indirect cost rate as follows:

| Year | Nation's Fixed with Carry Forward Rate |
|------|----------------------------------------|
| 2006 | 13.41% |
| 2007 | 15.92% |
| 2008 | 15.05% |

If a subsequent audit of a contract year showed that the rate for that year should have been higher (or lower), i.e., that it did not accurately compensate the Nation for its actual indirect costs

incurred for the year, a compensating adjustment would be made to a *future* year's rate, but the original fixed rate itself remained unchanged for the contract year to which it applied.[1]

25.      The product of applying the agency's indirect cost rate to the direct cost base is the contractor's indirect contract support cost requirement.   This is the process IHS used to calculate the Choctaw Nation's indirect contract support cost requirement in FY 2006, FY 2007 and FY 2008.

*ii.   Direct contract support costs.*

26.      The IHS Manual also instructs how <u>direct contract support cost</u> requirements will be determined in any given year.   The Choctaw Nation's direct contract support cost requirements were determined pursuant to the IHS Manual in connection with the Nation's FY 2006, FY 2007 and FY 2008 contracts.

27.      The IHS Manual instructs that direct contract support costs are negotiated according to detailed guidelines set forth in the Manual and an Appendix.  IHM § 6-3.2D; IHM Exhibit 6-3-H.   Once negotiated, direct contract support costs are paid on a "recurring basis" (IHM §§ 6-3.2D, 6-3.2D(2)), meaning they "do not require annual rejustification to the Secretary . . . ."  IHM § 6-3.1E(12).  <u>See also</u> IHM § 6-3.3B(2) ("As stated in paragraph 6-3.2D, DCSC

---

[1]  OMB Cir. A-87, Attachment E, § B.6 ("'Fixed rate' means an indirect cost rate which has the same characteristics as a predetermined rate, except that the difference between the estimated costs and the actual, allowable costs of the period covered by the rate is carried forward as an adjustment to the rate computation of a subsequent period.");<u>see also</u> Dep't of Justice, Office of Justice Programs 2011 Financial Guide, Glossary of Terms, <u>available at</u> http://www.ojp.usdoj.gov/financialguide/Appendices/ glossary.htm ("Fixed Rate with Carry Forward Provision is similar to a predetermined rate in that a permanent rate is established for a specific future period (usually one fiscal year) based on an estimate of the costs for that period. However, fixed rates also require an adjustment to actual costs once actual costs have been determined.  The difference between the estimated costs used to establish the fixed rate and the actual costs of the fiscal year covered by the rate is 'carry forward' [sic] as an adjustment to the next rate negotiation.").

funding is provided on a recurring basis."); IHM § 6-3.4E(1) ("The amount of the DCSC is provided to the awardee on a recurring basis and will not be reduced, but the amount may be renegotiated annually at the option of the awardee.").  Once negotiated, direct contract support costs are increased "by the amount needed to increase prior year DCSC funding by the national OMB non-medical inflation rate . . . ."  IHM § 6-3.3B(2).

28.     The IHS Manual provides a final step in connection with the determination of a Tribe's contract support cost requirement, concerning duplicative costs.  In this last step, all costs are reviewed for duplication to verify that the determined contract support costs do not duplicate contract funds being paid to a contracting Tribe as part of the Secretarial amount.  IHM § 6-3.2B. At the conclusion of this process, *"[t]his adjusted CSC requirement is the Section 106(a)(2) amount that the awardee is eligible to receive,* subject to available appropriations."  Id. (emphasis added).  This "adjusted CSC requirement" is the contract price for the contract support costs to be paid by IHS to a contracting Tribe.

### D.     Other Terms of the Contracts.

29.     The Choctaw Nation's contracts, together with the ISDA provisions incorporated into the contracts by operation of law, required that the Nation be paid no less than the full amount of the Nation's contract support cost requirement as determined under the IHS Manual.

### *i.   The timing of payments and earned interest*.

30.     The contract price is to be determined at the beginning of the contract year.  The ISDA provides that "[*u*]*pon the approval of a self-determination contract*, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under subsection (a) of this section . . . ."  25 U.S.C. § 450j-1(g) (citing § 450j-1(a)) (emphasis added); see also 25

U.S.C. § 458aaa-7(a) (authorizing "annual transfer of funding to be made at the beginning of a fiscal year"). Subsection (a), in turn, provides that the "contract price" consists of the two amounts—the Secretarial amount and the contract support costs—that "shall be added" to the contract. Necessarily, both of these amounts would be determined and fixed "[u]pon the approval of a self-determination contract." In the event of additional payments, the FAs provided that "[u]pon enactment of relevant Appropriations Acts, the [contract funding] amount will be adjusted as necessary and the Nation notified of such actions." E.g., 2007 FA § 7.

31.     Although the contract price is to be set at the commencement of the contract year, the statute permits the parties to choose whether the contract payments are to be made on an annual, semi-annual or quarterly basis. The Nation and IHS here agreed in the FAs for the payment to be made in a single lump sum annual payment at the beginning of the contract year. Compact Art. IV, § 4(a); 2007 FA § 3 Special Provision 11 ("Within 10 days of IHS apportionment, 100 percent of all base funding and 100 percent of Headquarters and Area Office tribal shares will be made available unless lesser amounts are authorized in accordance with a Congressional budget continuing resolution."). Thus, under the express terms of the contracts, full payment to the Nation was due at the commencement of the contract year.

32.     The Nation's Compact and the statute both provide that funds paid to the Nation could earn interest, and that any such interest income could be used by the Nation for the provision of additional services and would not diminish the amount due to the Nation. See Compact Art. IV, § 4(b) ("The Nation shall be allowed to retain interest earned on funds advanced pending disbursements as permitted by law. Interest earned on advances shall not diminish the amount of funds the Nation is authorized to receive or in any subsequent year."); 25

12

U.S.C. §458aaa-7(h) ("An Indian tribe is entitled to retain interest earned on any funds paid under a compact or funding agreement to carry out governmental or health purposes and such interest shall not diminish the amount of funds the Indian tribe is authorized to receive under its funding agreement in the year the interest is earned or in any subsequent fiscal year.")

*ii. The right to collect third-party program income*.

33.     When IHS operates a health facility, it is generally authorized to bill and collect payments from Medicare, Medicaid and private insurers for services provided to covered patients.  Such collections generate funds supplemental to funds appropriated to IHS.  See 25 U.S.C. §§ 1621e, 1645; 42 U.S.C. §§ 1395qq, 1396j.  This is because an IHS health program is a "payer of last resort."  25 U.S.C. § 1623(b) ("Health programs operated by the Indian Health Service, Indian tribes, tribal organizations, and Urban Indian organizations . . . shall be the payer of last resort for services provided by such Service, tribes, or organizations to individuals eligible for services through such programs, notwithstanding any Federal, State, or local law to the contrary.")

34.     The FAs with the Nation also provided that the Nation would engage in such third-party billing and collection.  Special Provision 6 of section 3 of the 2007 FA provides that the "Nation will bill directly to the State Medicaid Programs and Blue Cross and Blue Shield of Texas for Medicare as authorized by Section 405(c)(2) of the Indian Health Care Improvement Act . . . ."  2007 FA § 3 Special Provision 6; see also 2003 FA § 3 Special Provision 9 (same).  Thus, under the contracts, the Nation was entitled to collect supplemental revenues that would be generated by billings to and payments by federal, state and private insurers.

35. Pursuant to the authorities noted above, the Nation billed and collected revenues from Medicare, Medicaid and private insurers for services rendered to covered beneficiaries of those programs. The Nation's annual audits for all of the subject years were regularly provided to IHS and they set forth the Nation's collections from Medicare, Medicaid and private insurance plans.

### iii. *The right to spend, reallocate or rebudget funds*.

36. The Nation's Compact authorized the Nation, to "redesign services of the [IHS] under the terms set forth in the Compact (Article II) and Funding Agreement; [and] to reallocate funding for such services, according to its tribal priorities . . . ." Compact, Art. I, § 2(b). Further, the Compact provided that "[r]eallocation of funds to other health programs, activities, functions or services shall not require Secretarial consent" subject to limitations included in specific appropriations Acts or other applicable law. Compact Art. II, § 4; see also 2007 FA§ 2 ("The Nation is authorized to plan, conduct, consolidate, administer and, subject to the terms of the Compact and applicable law, redesign the services and funding identified within the General Budget Categories as a consolidated tribal government budget."). Similarly, the ISDA provides that the Nation may "reallocate or redirect funds for such [contracted] programs, services, functions, and activities (or portions thereof) in any manner which the Indian tribe deems to be in the best interest of the health and welfare of the Indian community being served . . . ." 25 U.S.C. § 458aaa-5(e).

37. Funds paid under the Compact were not required to be spent in the year for which they were paid. See Compact, Art. IV, § 9 ("Any funds not expended during the term of any of the compact fiscal years may be carried over and spent in the succeeding years and that carryover

shall not diminish the amount of funds the Nation is authorized to receive in any succeeding compact year.").  The related ISDA provision similarly states that "[a]ll funds paid to an Indian tribe in accordance with a compact or funding agreement shall remain available until expended. In the event that an Indian tribe elects to carry over funding from 1 year to the next, such carryover shall not diminish the amount of funds the Indian tribe is authorized to receive under its funding agreement in that or any subsequent fiscal year."  25 U.S.C. § 458aaa-7(i).

*iv.  <u>Interpretation</u>.*

38.     In interpreting the IHS's obligations, the Supreme Court has said that "[c]ontracts made under ISDA specify that '[e]ach provision of the [ISDA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor . . . .'"  25 U.S.C. § 450*l*(c), (model agreement §1(a)(2))."  <u>Ramah</u>, 132 S. Ct. at 2191; <u>see also</u> Compact, Art. IV, § 23 ("In the implementation of the Compact, the Secretary, to the extent feasible, shall interpret federal laws and regulations in a manner that facilitates this Compact in accordance with Section 303(e) of the Act."[2]).  The Supreme Court has interpreted this language to mean that the Government "must demonstrate that its reading [of the ISDA] is clearly required by the statutory language." <u>Ramah</u>, 132 S. Ct. at 1291.

**E.  The Claims Presented.**

39.     The Nation's FY 2006, FY 2007 and FY 2008 claims are based on the contract documents—the Compact, Funding Agreements, Indirect Cost Rate Agreement and others—that are part of the Record.

---

[2]   Section 303 of Title III provided that "[t]o the extent feasible, the Secretary shall interpret Federal laws and regulations in a manner that will facilitate the agreements authorized by this title."  Pub. L. 100-472 (1988), 102 Stat. 2285.

40.     The Choctaw Nation's contracts required that the Nation be paid no less than the full amount of the Nation's contract support cost requirement as determined under the IHS Manual, subject only to the availability of appropriations.  Under <u>Cherokee</u>, <u>Ramah</u>, and <u>Arctic Slope II</u>, appropriations during each of FY 2006 through FY 2008 were legally available to pay the Nation's contract support cost requirement in full.

41.     During each of fiscal years 2006 through 2008, the Secretary failed to pay the full amount of the Choctaw Nation's contract support cost requirement.  The Secretary's failure was contrary to the Nation's statutory and contractual rights as set forth by the Supreme Court in <u>Cherokee</u> and <u>Ramah</u>, and as further specified in the Nation's contracts with IHS and in the ISDA.  <u>See</u> 25 U.S.C. §§ 450j-1(a)(2), 450j-1(a)(3), 450j-1(a)(5), 450j-1(b), 450j-1(d)(2), 450j-1(g).

42.     On September 18, 2012, the Nation presented a claim letter to the IHS for breach of contract claims for FY 2006 through 2008.[3]  The letter claimed damages from the Secretary's breach of the duty to pay the Nation the full amount of contract support cost requirement calculated pursuant to IHS's policies, including amounts for the indirect contract support cost shortfall, the direct contract support cost shortfall, indirect contract support cost shortfall on the unpaid direct contract support cost amount, and the lost third-party revenue damages.  Second, the letter claimed damages from the Secretary's breach of the duty to properly calculate the indirect administrative CSCs that the Choctaw Nation was entitled to be paid under the ISDA, as explained in <u>Ramah Navajo Chapter v. Lujan</u>, 112 F.3d 1455 (10th Cir. 1997).  The Nation sought "without limitation, all other damages arising out of IHS's failure to pay full contract support costs as required by the ISDEAA and Choctaw's contracts."

---

[3]  The letter asserted claims covering FY 2006 through 2011, but only FY 2006 through 2008 are at issue here.

43.     The IHS failed to render a decision on these claims.  In the face of this failure, the Choctaw Nation deemed the contracting officer's inaction to be a denial (41 U.S.C. § 7103(f)(5)).  The Choctaw Nation has timely appealed to this Court from this denial.

**F.      IHS Shortfall Reports**.

44.     The Secretary has conceded that the Nation did not receive full payment of the contract support costs due to the Nation in each covered year, because the Secretary contemporaneously documented the underpayment each year.  The ISDA requires IHS to report to Congress each year on the agency's calculation of the contract support costs that are due, and what it actually paid against what was due.  25 U.S.C. § 450j-1(c); see also IHM § 6-3.5B (requirement to prepare annual reports).  Because IHS has chronically underpaid the amounts due to tribal contractors, Congress mandated that the annual report also include "an accounting of any deficiency in funds needed to provide required contract support costs to all contractors for the fiscal year for which the report is being submitted . . . ."  25 U.S.C. § 450j-1(c)(2).  These reports accordingly have become known as the "IHS Contract Support Cost Shortfall Reports."

45.     These Reports show the math which IHS employed to calculate the Nation's indirect contract support cost requirement, including the "Direct Cost Base" (or "program base"); the Nation's "IDC [indirect cost] Rate;" and the resulting "IDC [indirect cost] Need." E.g. Fiscal Year 2007 IHS Contract Support Cost Shortfall Report, Oklahoma Area, cols. N, O, Q.  (Each Report was prepared a few months after the close of each fiscal year, so that the "2007 Report" actually details the data for fiscal year 2006, and so forth).  The Reports also show the inflation-adjusted amount of direct contract support costs due.  Id., col. I ("DCSC [Direct Contract Support Cost] Negotiated Need").

17

46.     The Reports were prepared after an opportunity for consultation with the Choctaw Nation (IHM § 6-3.5B(1)); they were certified by the Oklahoma Area Office as accurate (IHM § 6-3.5B(1)); and they were approved by the IHS Director (IHM § 6-3.5B(3)).

47.     The IHS Shortfall Reports understate the actual amount of the shortfall owed to the Nation.  For instance, they do not take account of the fact that IHS owes additional indirect contract support costs on any portion of the direct contract support cost requirement that was not actually paid to the Nation.  The Reports also fail to take account of the third-party revenue damages owed to the Nation as a direct consequence of the Secretary's breach of contract.  Thus, the amounts set forth in the annual Shortfall Reports are the minimum additional amounts IHS would have paid the Choctaw Nation had IHS each year fully paid all of the Nation's contract support cost requirements.

48.     Nonetheless, the Shortfall Reports constitute binding party admissions by the Secretary of the minimum additional contract support cost amounts owed by the Secretary to the Choctaw Nation.  The IHS is estopped from denying the accuracy, admissibility and completeness of these congressionally-mandated Shortfall Reports.

## V.  FIRST CAUSE OF ACTION
### (Breach of Contract Shortfall Claim)

49.     The Choctaw Nation incorporates all previous allegations of fact and law into this Cause of Action.

50.     The Choctaw Nation's contracts required the Secretary to fully fund the Nation's contract support cost needs.  In doing so, the contracts incorporated the statutory provisions of the ISDA requiring full payment of contract support costs.  In the <u>Cherokee</u>, <u>Ramah</u> and <u>Arctic</u>

Slope decisions, the Supreme Court and the Federal Circuit affirmed the Government's duty to fully pay these contracts in the years at issue here.

51.     Despite the Government's duty to pay the Nation the full contract price of the Nation's FY 2006, FY 2007 and FY 2008 contracts, the Secretary failed to do so.  This failure was recorded in the Shortfall Reports, compiled by the agency and signed by the Secretary, certifying the amount of underpayment every year.  In failing to pay the Nation the full contract price of its contracts, the Government breached its contracts with the Choctaw Nation.

52.     General contract principles control the calculation of damages in government contract litigation.  This is so because "'[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'"  Winstar v. United States, 518 U.S. 839, 895 (1996) (quoting Lynch v. United States, 292 U.S. 571, 579 (1934)).  See also Mobil Oil Exploration & Producing Se., Inc. v. United States, 530 U.S. 604, 607–08 (2000) (quoting Winstar and relying on the RESTATEMENT (SECOND) OF CONTRACTS (1981) ("RESTATEMENT")); Franconia Assocs. v. United States, 536 U.S. 129, 141 (2002) (quoting Mobil Oil and applying principles of general contract law).

53.     General contract law on the issue of damages is clear:  a contractor is entitled to damages which will protect "his 'expectation interest,' which is his interest in having the benefit of his bargain *by being put in as good a position as he would have been in had the contract been performed . . . .*"  RESTATEMENT § 344(a) (emphasis added).

54.     In order to fulfill the Nation's "expectation interest" arising from the Secretary's breach of contract for failing to pay the contract amount owed, the Nation is entitled to three categories of damages, as set forth below.

**A.  Damages for Underpayment of Direct and Indirect Contract Support Costs.**

55.     During each of years FY 2006 through FY 2008, the Secretary failed to meet her statutory and contractual obligations to the Nation by failing to pay the Nation's full contract support cost requirement, as recorded in the Shortfall Reports.  The Secretary's annual failure to pay the Nation the full contract support cost requirement constitutes for each year a separate breach of statutory and contractual rights.

56.     The Nation's contracts with the Secretary were fixed-price contracts.  Each year the Secretarial amount was negotiated and fixed, the direct contract support cost amount was negotiated and fixed, and the indirect cost amount was based on a "fixed" rate.  None of these amounts was made payable on a "reimbursement" basis, none was dependent upon receipt of invoices or vouchers, and none was refundable to the Secretary.  All the indirect and direct contact support cost sums identified by the Secretary in her CSC Shortfall Reports in connection with the Nation's contracts would have been paid in full to the Nation but for the Secretary's conclusion that appropriations were unavailable to make those payments.  Thus, the Government is liable to the Nation for the unpaid amount of the Nation's full direct and indirect contract support cost requirements, together with accrued interest and attorneys' fees and costs, as specifically prayed below.

**B. Damages for Failure to Pay Indirect Contract Support Costs on Direct Costs Owed.**

57.     Contract support costs are made up of direct costs and indirect costs.  Direct contract support costs, comprising expenses directly attributable to a certain program or activity, are, by definition, not added to the indirect cost pool.  Instead, these costs are part of the direct cost base.  IHM § 6-3.4E(1) ("The DCSC, along with other Section 106(a)(1) funds, will be considered part of the recurring base of the award.").  As part of the direct cost base, these direct costs are eligible for indirect contract support costs.  In administering these direct costs, the Nation incurs costs which, under the IHS Manual, are to be included in its indirect contract support costs.  See id.

58.     The failure of the IHS to fully fund the Nation's direct contract support costs resulted in a corresponding shortfall in the Nation's indirect contract support cost payments, over and above the shortfall in indirect contract support costs recorded in the Shortfall Reports.  To make the Nation whole, IHS is required to pay not only the underfunded amount of direct contract support costs but also an amount equal to this underfunded amount multiplied by the Nation's indirect cost rate.

**C. The Damages for Lost Third-Party Revenues.**

59.     Expectancy damages for breach of the Secretary's contracts with the Nation are measured by the amounts required to place the Nation in the position it would have been in had there not been a breach.  Thus, "an award of damages will often include an amount representing the profits that were lost as a result of the defendant's breach of contract, because *only by awarding lost profits will the plaintiff be made fully whole*."  WILLISTON ON CONTRACTS § 64:2

(4th ed.) (emphasis added); see also RESTATEMENT § 347(b) (recoverable damages may include "incidental or consequential loss, caused by the breach").

60.     In order to recover damages in the form of lost profits, a contractor must establish three elements by a preponderance of the evidence: foreseeability, causation and reasonable certainty; in other words that (1) the lost profits were actually foreseen by the breaching party at the time of contracting (or else were reasonably foreseeable by that party); (2) the Government's breach caused the contractor's loss; and (3) the amount of the loss can be established with reasonable certainty.  Anchor Sav. Bank, FSB, v. United States, 597 F.3d 1356, 1361 (Fed. Cir. 2010); see also Bluebonnet Sav. Bank, FSB, v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (citing RESTATEMENT §§ 347, 351, 352).

61.     The Nation's receipt of collections from Medicare, Medicaid and private insurance plans for services provided by the Nation was both an integral part of each contract, see 2007 FA § 3 Special Provision 6, and was actually foreseeable.  Indeed, the Government uses the prospect of these third-party revenues as a means of encouraging Tribes to enter into self-governance contracts.  See OFFICE OF TRIBAL SELF-GOVERNMENT, INDIAN HEALTH SERVICE, U.S. DEP'T OF HEALTH AND HUMAN SERVICES, THE INDIAN HEALTH SERVICE TRIBAL SELF-GOVERNANCE PROGRAM, available at http://www.ihs.gov/selfgovernance/documents/zcard.pdf.

62.     At all relevant times the Government was well aware that the failure to pay full contract support costs to the Nation would result in reduced services and thus reduced collections from third-party payers.  Since at least 1987, the federal government has been aware that when Tribes face contract support cost shortfalls, they are forced to use program money to cover the shortfall, which "results in decreased amounts of funds for services," see S. REP. NO. 100-274 at

12 (1987), and that reduced program services meant there would be less billing to and collections from third-party payers.  It was thus reasonably foreseeable that, if IHS underpaid the Nation the amounts due under the Nation's contracts for contract support costs, the Nation would receive fewer collections from third-party payers.

63.     The Government's breach caused the Nation to lose third-party collections. Because of the Government's failure to fully fund the Nation's contract support costs, the Nation was required to divert program funds to pay for the shortfall in contract support cost payments. This resulted in a reduction of program services that the Nation could provide, and a consequent reduction in billings to third party payers.  Thus, but for the Government's breach in failing to pay full contract support costs, the Nation would have provided additional medical program services for which the Nation would have collected additional revenues.

64.     The Nation's damages for lost third-party collections are provable to a reasonable certainty based on the actual yearly rate of return on the services it did provide under its contracts.  The Nation's income from Medicare, Medicaid and private insurance plans is regularly reported in the Nation's audits.  From those audits one can readily calculate the ratio that actual collections bore to IHS contract payments in each year.  This actual historical rate of return provides a reasonable basis for calculating the Nation's damages for lost third-party collections.  See Ramah Navajo School Board v. Sebelius, No. 6:07-cv-00289 at 62 (D.N.M. May 9, 2013) (finding that calculating third-party revenues based on a collection rate to be "a reasonable and satisfactory methodology" and on that basis awarding damages to an ISDA contractor).

65.     The record here shows that (1) the Nation's lost collections from Medicare, Medicaid and private insurance plans were reasonably foreseeable by the Secretary; (2) the Secretary's breach by failing to pay in full the contract price caused these losses; and (3) the amount of the losses can be established with reasonable certainty by reference to the Nation's audits.  The Nation is therefore entitled to recover additional damages against the Secretary to compensate for these losses in third-party revenues.

66.     The Government is liable to the Nation in damages for the amounts required to place the Nation back in the position it would have been in had there been no breach of the Secretary's duty to pay the Nation's contract support costs in full, including not only the unpaid contract support costs but also the associated lost third-party collections.

## VI.  SECOND CAUSE OF ACTION
### (Miscalculated Rate Claim)

67.     The Choctaw Nation incorporates all previous allegations of fact and law into this Cause of Action.

68.      During each of FY 2006 through FY 2008, the Secretary failed to meet her statutory and contractual obligations to the Choctaw Nation by failing to pay the Nation the full amount of indirect contract support costs to which the Nation was entitled under the ISDA.  IHS, pursuant to its CSC Circulars, acted unlawfully by using, as an automatic proxy for the determination of such CSCs, the unadjusted annual "indirect cost rate" assigned to the Choctaw Nation by the NBC.  The "indirect cost rate" annually assigned to the Choctaw Nation was to be used strictly for certain cost-recovery accounting purposes, and the applicable OMB guidelines caution that such rates are not to be used to determine a federal agency's funding obligations under contracts or grants.  See, e.g., OMB Cir. A-87 ("The principles are for determining

24

allowable costs only.  They are not intended to identify the circumstances or to dictate the extent of Federal and governmental unit participation in the financing of a particular Federal award."), 2 C.F.R. § 225.20 (same).  Nonetheless, each year IHS, by policy and practice, required that the amount of the Choctaw Nation's indirect CSCs be determined by application of the Choctaw Nation's most recent "indirect cost rate" assigned to the Choctaw Nation by the DOI.  This practice was contrary to law, as held in <u>Ramah Navajo Chapter v. Lujan</u>, 112 F.3d 1455 (10th Cir. 1997).

69.     The Secretary's reliance on the unadjusted "indirect cost rate" disadvantaged the Choctaw Nation in the following respects:

(a)     the indirect cost rate relied upon by IHS calculated the IHS's responsibility for indirect costs based upon the incorrect assumption that all agencies contributing to the Nation's direct cost base would contribute in full proportional amounts to the indirect cost pool, when in fact some such agencies did not so contribute to the pool.  The impact of this assumption was to reduce the calculation of the Nation's indirect costs as compared to the costs actually associated with operating the Nation's contracts with IHS;

(b)     the indirect cost rate that IHS applied to the Nation adjusted twice, instead of once, adverse carryforward adjustments from prior years (an error which, had it not occurred, would have produced a higher indirect cost rate); and

(c)     the indirect cost rate that IHS applied to the Nation failed to adjust the carryforward computations that are a part of the indirect cost computations, so that shortfalls in IHS indirect cost payments that were caused by the alleged insufficiency in IHS appropriations were not carried forward to future year rate computations (where such adjustments would have produced a higher indirect cost rate had they been carried forward).

70.     The Government is liable to the Nation for the amounts the Secretary would have paid had the Secretary used the properly adjusted indirect cost rates for calculating the Nation's indirect contract support cost requirement associated with carrying out the Secretary's programs under contract, together with accrued interest, attorneys' fees and costs.

## VII.  PRAYER FOR RELIEF

WHEREFORE, the Choctaw Nation prays that this Court grant the following relief:

(a)     A declaratory judgment (i) that the Secretary acted in violation of the ISDA by failing to pay the Choctaw Nation the full amount of contract support costs that the Nation was due under its contracts with the Secretary, as properly calculated, and (ii)) that the Secretary breached her contracts with the Nation by failing to pay the full contract support cost requirement, as properly calculated, that was due to the Nation in each of FY 2006, FY 2007 and FY 2008; and

(b)     A money judgment for the amount due to the Choctaw Nation as a result of the Secretary's breach of contract in each of FY 2006, FY 2007 and FY 2008, including damages for underpayment of contract support costs, for miscalculation of contract support costs and for loss of third party revenues that the Nation would have received had the contract not been breached by IHS; and

(c)     Interest for one year from the payment due date for each payment the Secretary failed to make under each contract, as provided for under the Prompt Payment Act, 31 U.S.C. §§ 3901–3907; and

(d)     Interest under the Contract Disputes Act, 41 U.S.C. §§ 7101–7109, from the date of each claim until the date of payment upon entry of final judgment; and

(e)     Costs and attorneys' fees incurred in pursuing this claim, including the appeal before this Court, as provided for under the Equal Access to Justice Act, 5 U.S.C. § 504; 28 U.S.C. § 2412; 25 U.S.C. § 450m-1(c) and other applicable law; and

(f)     Such other monetary, declaratory and equitable relief as this Cost may find to be just.

///

///

///

///

///

///

///

26

Respectfully submitted this 26th day of September 2013.

SONOSKY, CHAMBERS, SACHSE
MILLER & MUNSON, LLP

*/s/ Lloyd B. Miller*

By: _____

Lloyd B. Miller
D.C. Bar No. 317131
AK Bar No. 7906040
Donald J. Simon
D.C. Bar No. 256388

900 West Fifth Avenue, Suite 700
Anchorage, AK  99501
Telephone: (907) 258-6377
Facsimile: (907) 272-8332
E-mail: Lloyd@sonosky.net